**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**DAVID W. PRIDGEON,**

      **Petitioner,**

**vs.**

                                **CASE NO. 4:05cv461-SPM/WCS**

**JAMES McDONOUGH,**

      **Respondent.**

_____/

**REPORT AND RECOMMENDATION**

      This is an amended petition for writ of habeas corpus filed by David W. Pridgeon pursuant to 28 U.S.C. § 2254.  Docs. 28 and 29 (memorandum).  The amended petition presents the same twelve claims as in the petition originally filed.  A new claim thirteen has been abandoned.  Doc. 30, p. 17.  *See* Doc. 31.  Petitioner challenges his convictions and life sentence after trial by jury.  The convictions were  in the Circuit Court of the Third Judicial Circuit, Madison County, Florida, case number 99-30-CF for burglary and sexual battery upon a child less than 12 years of age.  Respondent filed an answer to the original petition, doc. 19, and the state record, doc. 17.  There was no

need to file an amended answer as the amended petition brought the same twelve claims as the initial petition.  Petitioner filed a traverse, doc. 30.

Respondent concedes that the petition was timely filed and that Petitioner exhausted his state court remedies as to the twelve claims presented.  However, as explained ahead, in several instances it is found that Petitioner did not exhaust a specific federal claim presented to this court.  The state courts did not hold an evidentiary hearing on Petitioner's claims.

**Trial Evidence**

The trial evidence is presented in the answer.  Doc. 19, pp. 6-15.  To summarize, the victim, C.H.,[1] was a four year old male child.  He testified that Petitioner came through the window of his bedroom and sucked on his "pee pee."  The victim reported this to his mother in the morning and she called the police.  Petitioner lived in a mobile home, two residences away from the victim's home.  A chair was found outside the victim's window and the screen was torn.  A footprint under the window matched one of the black boots that Petitioner owned and was wearing the next day and Petitioner's fingerprint was found on the window.  Some substance, perhaps saliva, found in the victim's underwear contained DNA consistent with the DNA of both the victim and the Petitioner.

**Section 2254 Standard of Review**

"Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court.  28 U.S.C. §§ 2254(b)(1), (c)."  O'Sullivan v.

---

[1] While the names of the victim and his family members are in other documents in this record, this report and recommendation will use only initials.

Boerckel, 526 U.S. 838, 839, 119 S.Ct. 1728, 1730, 144 L.Ed.2d 1 (1999).  To properly

exhaust remedies as required by § 2254(b), "the federal claim must be fairly presented

to the state courts."  Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d

438 (1971), Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865

(1995) (citing Picard).

    If a claim was not fairly presented but is procedurally barred from further state

court review,[2] Petitioner must demonstrate cause for the default and actual prejudice, or

demonstrate that the constitutional violation has probably resulted in conviction of an

innocent person.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115

L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-

71, 113 L.Ed.2d 517 (1991).

    For claims that were properly exhausted and adjudicated in state court, this

court's review is limited.  "[A] determination of a factual issue made by a State court

shall be presumed to be correct," and Petitioner has "the burden of rebutting the

presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1);

Bui v. Haley, 321 F.3d 1304, 1322 (11th Cir. 2003) (citing the statute, footnote omitted).

Moreover, as to a factual issue adjudicated by the state court, Petitioner must show that

the adjudication "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court

proceeding."  § 2254(d)(2); 321 F.3d at 1322 (citing the statute).  Section 2254(d)(2) is

---

    [2] Procedurally defaulted claims are considered technically exhausted because
state court remedies no longer remain "available."  The court therefore refers to "fairly
presented" claims as having been properly exhausted, to distinguish them from claims
exhausted by procedural default.  See O'Sullivan, 526 U.S. at 848, 119 S.Ct. at 1734.

satisfied "only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record." Lomholt v. Iowa, 327 F.3d 748 , 752 (8th Cir. 2003) (citing § 2254(e)(1), other citation omitted).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). "[C]learly established Federal law, as determined by the Supreme Court of the United States," refers only to holdings (rather than *dicta*) of the Supreme Court, but decisions of lower federal courts may be considered to the extent that they demonstrate how those courts applied Supreme Court holdings. Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted); Carey v. Musladin, __ U.S. __, 2006 WL 3542760, *3 (December 11, 2006).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings. Williams v. Taylor, 529 U.S. 362, 404-406, 120 S.Ct. 1495, 1519-1520, 146  L.Ed.2d 389 (2000); Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citing Williams).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. at 412-413, 120 S.Ct. at 1523; 535 U.S. at 694, 122 S.Ct. at 1850.

"Avoiding these pitfalls [described in Williams v. Taylor] does not require citation of our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."   Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (emphasis in original).   Further,   "whether a state court's decision was unreasonable must be assessed in light of the record the court had before it."   Holland v. Jackson, 542 U.S. 649, 652, 124 S.Ct. 2736, 2738, 159  L.Ed.2d 683 (2004).

The basic law governing ineffective assistance of counsel claims (establishing a two step test) was clearly established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984).  Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520; Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850.  Under the two part test of Strickland, Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."  Chandler

v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), *cert. denied,* 531 U.S. 1204 (2001).  *See also* Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing Chandler).  There are no rigid requirements or absolute duty to investigate a particular defense.  Fugate v. Head, 261 F.3d at 1217.

> Indeed, "[c]onsidering the realities of the courtroom, more is not always better.  Stacking defenses can hurt a case.  Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."

*Id.*

For prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

Although Strickland explained the performance and prejudice prongs of analysis, "there is no reason . . . to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S.Ct. at 2069.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Id.*

A state court's adjudication of an ineffectiveness claim does not satisfy the "contrary to" language of § 2254(d)(1) even if this court might have applied Strickland differently.  Williams, 529 U.S. at 406, 120 S.Ct. at 1520; Bell, 535 U.S. at 698, 122 S.Ct. at 1852.  To determine whether the state court's adjudication was an "unreasonable application" of Strickland, Petitioner "must do more than show that he

would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . .  Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner."  Bell, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* Williams).  "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  Williams v. Taylor, 529 U.S. at 410, 120 S.Ct. at 1522.

**Ground One**

There was a pretrial hearing to determine the competency of the victim to testify at trial and the child was found competent to testify.  Petitioner contends his attorney was ineffective because he failed to make a contemporaneous objection, when the child testified, "regarding the minor[']s lack of moral obligation to tell the truth."  He argues that the competency hearing only focused upon the child's ability to observe and recollect, mostly recent events.  He argues that there was no attempt to determine whether the child could recall events occurring eight months to two years earlier.  He contends that this error resulted in the issue not being preserved for appeal.  Petitioner asserts that his attorney was ineffective not objecting to the failure of the trial court to determine whether the child was capable of observing and recollecting facts and relating them to the jury, and whether the child had a moral sense of the obligation to be truthful.

Both parties rely upon the same state law for determining the competence of a child witness:

> [T]he prime test of testimonial competence of an infant witness is his or her intelligence, rather than his or her age, and, in addition, whether the child possesses a sense of obligation to tell the truth.  The test has been

reiterated in multiple district court of appeal decisions.  It is the established
law of this state that if an infant witness has sufficient intelligence to
receive a just impression of the facts about which he or she is to testify
and has sufficient capacity to relate them correctly, and appreciates the
need to tell the truth, the infant should be permitted to testify.  It is within
the discretion of the trial judge to decide whether an infant of tender years
has sufficient mental capacity and sense of moral obligation to be
competent as a witness.  Except when there is an abuse of that discretion,
the trial court's decision will not be disturbed.

Lloyd v. State, 524 So. 2d 396, 400 (Fla. 1988) (citations omitted).

The state judge who tried this case also ruled upon Petitioner's Rule 3.850

motion.  As to this claim, the court ruled:

The State correctly points out that the witness [C.H.] was found competent
by this Court at a competency hearing.  The competency of a witness is
not determined by the nature or manner of an objection by counsel, but by
the belief of the Court that the witness understands the duty to tell the
truth.  Therefore, there is no basis to grant relief in Claim I.

Doc. 17, Ex. N; see also Ex. P.

It appears that what the trial court was saying is that there was no prejudice

because the court's ruling was based upon observations of C.H. and no objection would

have changed the result.  As noted earlier, the state court need not even be aware of

controlling Supreme Court law as long as its decision does not contradict that law.

But even if the state court did not apply Strickland, the ineffective assistance

claim is without merit.  While the child was not asked to relate anything about his

expected testimony, he was able to name the persons with whom he lived and name his

day care teacher, describe games he played, name food he liked, and correctly identify

articles of clothing and colors.  Doc. 17, Ex. C (trial transcript), pp. 168-174.  He was

also examined by both the prosecutor and Petitioner's attorney about his understanding

of the difference between the truth and a lie, and he knew the difference.  Id., pp. 169-

170, 174-176.  He knew that he would get "a whipping" and get in trouble if he told a lie.

*Id.*, pp. 169-170.  He said that he knew that it mattered if he told something that was not

true and he did not get a whipping, explaining: "You got to get a whipping when you

need one."  *Id.*, p. 176.

Further, the objections that Petitioner faults his attorney for not making were

made.  Petitioner's trial lawyer, Brant Hargrove, objected to the testimony of C.H.,

arguing that the child did not understand that it was wrong (morally wrong) to lie.  *Id.*, p.

184.  He acknowledged that the child knew that if he got caught lying, he would be

punished, but said:

> But if you don't know the consequences beyond that, that is, to appreciate
> the significance of telling the truth, whether you get punished or not, is the
> essence of telling the truth versus not telling the truth.  And that's what
> [C.H.] lacks.  He's not old enough to appreciate the significance.

*Id.*  The trial rejected this objection, finding that the child understood the difference

between a lie and the truth "and that there were consequences if you did not tell the

truth."  *Id.*, p. 185.

Petitioner has not shown that this was error or that an appeal of this decision had

any merit.  A five year old child cannot be expected to explain ethics in the abstract.  It

was enough that he knew that a lie was wrong, would have adverse consequences, and

that such consequences would be deserved.  Petitioner has not shown that his attorney

could have done anything more, nor has he shown that had an objection been renewed

when the child testified, the claim would have been successful on appeal.

Neither attorney error nor prejudice to the outcome has been shown as to ground

one.  Therefore, Petitioner has not shown that the state court's adjudication of the

merits of this federal claim has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Two**

Petitioner contends that his attorney was ineffective for failing to keep from the jury a statement by Police Officer Chris Andrews that the younger brother of the child victim, S. H., told him: "Wayne [Petitioner] come through the window twice, and one time Wayne pulled my shirt up, and my pants down, but that was all he had done." Petitioner points out that the trial court found S.H. to be incompetent to testify because he was too young, and therefore S.H. was not available as a witness.  He contends that because S.H. was not available to testify, pursuant to FLA. STAT. § 90.803(23), other corroborative evidence was needed to permit this statement into evidence.  He argues that other corroborative evidence was lacking.  He contends that as a consequence of ineffective assistance of counsel, he was denied his right to confront this witness.  He argues that the statement by S.H. was damaging to his defense because it was consistent with the evidence from the victim, C.H.

The trial was held on June 5-7, 2000.  Ex. C.  At the time of the trial, FLA. STAT. § 90.803(23) (1999) provided:

(23)  Hearsay exception; statement of child victim. –

(a)  Unless the source of information or the method or circumstances by which the statement is reported indicates a lack of trustworthiness, an out-of-court statement made by a child victim with a physical, mental, emotional, or developmental age of 11 or less describing any act of child abuse or neglect, any act of sexual abuse against a child, the offense of child abuse, the offense of aggravated child abuse, or any offense involving an unlawful sexual act, contact, intrusion, or penetration

performed in the presence of, with, by, or on the declarant child, not otherwise admissible, is admissible in evidence in any civil or criminal proceeding if:

> 1.  The court finds in a hearing conducted outside the presence of the jury *that the time, content, and circumstances of the statement provide sufficient safeguards of reliability.*  In making its determination, the court may consider the mental and physical age and maturity of the child, the nature and duration of the abuse or offense, the relationship of the child to the offender, the reliability of the assertion, the reliability of the child victim, and any other factor deemed appropriate; and

> 2.  The child either:

>> a.  Testifies; or

>> b.  Is *unavailable* as a witness, provided that there is other corroborative evidence of the abuse or offense.  Unavailability shall include a finding by the court that the child's participation in the trial or proceeding would result in a substantial likelihood of severe emotional or mental harm, in addition to findings pursuant to s. 90.804(1).

> *                    *                    *

(c)  The court shall make specific findings of fact, on the record, as to the basis for its ruling under this subsection.

FLA. STAT. § 90.803(23) (emphasis added).

As noted in <u>Townsend v. State</u>, 635 So. 2d 949 (Fla. 1994), the trial court had an

obligation under state law to:

> determine whether a hearsay statement is trustworthy and reliable by examining the "time, content, and circumstances" of the statement. Specifically, in examining the time, content, and circumstances of the hearsay statement, the court may consider the mental and physical age and maturity of the child, the nature and duration of the abuse or offense, the relationship of the child to the offender, the reliability of the assertion, the reliability of the child victim, and any other factor deemed appropriate.

635 So. 2d at 957.

> Other factors may include, but are not limited to, a consideration of the statement's spontaneity; whether the statement was made at the first available opportunity following the alleged incident; whether the statement was elicited in response to questions from adults; the mental state of the child when the abuse was reported; whether the statement consisted of a child-like description of the act; whether the child used terminology unexpected of a child of similar age; the motive or lack thereof to fabricate the statement; the ability of the child to distinguish between reality and fantasy; the vagueness of the accusations; the possibility of any improper influence on the child by participants involved in a domestic dispute; and contradictions in the accusation.

*Id.* at 957-958. <u>Townsend</u> further held that if FLA. STAT. § 90.803(23) and the guidance it established were followed, the requirements of the Confrontation Clauses of the United States and Florida Constitutions would also be satisfied. *Id.*, at 956-957.

When it ruled upon Petitioner's Rule 3.850 motion, the state court found that S.H. was available to testify and concluded, therefore, that corroborative evidence was not needed. Doc. 17, Exs. N and P. The court also found that corroborative evidence existed as noted in the State's response to Petitioner's Rule 3.850 motion. *Id.*

The trial court found S.H. to be incompetent to testify due to his age. Ex. C, p. 297. S.H. was two years old at the time of the offense. *Id.*, p. 300. "[A] finding of incompetency to testify because one is unable to recognize the duty and obligation to tell the truth satisfies the 'testify or be unavailable' requirement of section 90.803(23)." <u>Townsend</u>, 635 So. 2d at 956. Therefore, the finding that S.H. was available to testify was, in this case, an "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2).

When the trial court originally ruled upon the admissibility of the statement by S.H., it adopted the arguments of the prosecutor, that the statement met the criteria of

FLA. STAT. § 90.803(23) and Townsend for admissibility.  *Id.*, pp. 295-297.  The court specifically found:

> Well, as to the circumstances, of course, the time being within an hour or so after it had come to light they got up there [when the police arrived the next morning] and it was in the child's home, own home.
>
> And as he said here one officer knelt down and said what happened and he just related, [S.H.] came in, I mean [Petitioner] came in the window, pulled my shirt up and pants down, but just the fact that was the gist of what he said.

*Id.*, p. 296.  The court found the statement by S.H. to be spontaneous in response to the question by the police officer.  *Id.*  The court found there to be no pressure on the child or leading.[3]  *Id.*, p. 297.

In summary, the trial court found the statements to be reliable because S.H. was in his own home when he made the statement.  The statement was spontaneous in that the question was not leading, without pressure from the officer, and the answer was prompt in coming.  These findings complied with the first portion of the requirements of FLA. STAT. § 90.803(23) and Townsend.

The trial court did not specifically make findings as to other corroborating circumstances.  That should have been the next step since S.H. was not available as a witness and the court found the statement to be reliable.  Townsend, 615 So. 2d at 957

---

[3] The court then permitted Officer Andrews to testify that about an hour after he had arrived at the home, Officer Eberson knelt down beside S.H. and asked him "what happened."  *Id.*, p. 299.  Andrews said: "His response was that Wayne had come through the window, pulled his shirt up, pulled his pants down and then exited through the window."  *Id.*  After establishing that the child was two years old and that Officer Andrews had "no knowledge of what was said to the child prior to" his arrival at the scene, counsel objected to the testimony because it was unknown what might have been said to the child prior to arrival.  *Id.*, p. 300.  The objection was overruled.  *Id.*

(clarifying that the trial court must first determine the reliability of the unavailable

witness's statement and then determine whether other corroborating evidence is

present).  But, if counsel had objected, the objection would have been overruled

because corroborating circumstances existed.  There was the testimony of C.H.,

Petitioner's fingerprint on the window, the shoe print on the siding matching Petitioner's

boot, the tear in the window screen, the stool outside the window, and Petitioner's DNA

matching DNA found in the underwear of C.H.  Neither attorney error nor prejudice to

the outcome has been shown for failure to object to the lack of findings as to

corroborating evidence.  For these reasons, the state court's adjudication of the merits

of ground two has not "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States."[4]  § 2254(d)(1).

---

[4] Before leaving ground two, it is noted that four years later, the federal law
governing hearsay statements made under these circumstances changed dramatically.
Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) held:

> Where testimonial evidence is at issue, . . . the Sixth Amendment
> demands what the common law required: unavailability and a prior
> opportunity for cross-examination.  We leave for another day any effort to
> spell out a comprehensive definition of "testimonial."  Whatever else the
> term covers, it applies at a minimum to prior testimony at a preliminary
> hearing, before a grand jury, or at a former trial; and to police
> interrogations.  These are the modern practices with closest kinship to the
> abuses at which the Confrontation Clause was directed.

541 U.S. at 68, 124 S.Ct. at 1374 (footnote omitted).  See Contreras v. State, 910 So.
2d 901 (Fla. 4th DCA 2005) (finding Townsend and FLA. STAT. § 90.803(23) no longer
viable under certain circumstances after Crawford).  Petitioner has not made a Crawford
claim, and therefore the following observations are dicta.  These findings are provided
due to the pro se status of Petitioner and in the interests of completeness.  First, it has
been held in this circuit that Crawford announced a new rule that is not applicable on
post-conviction review.  Espy v. Massac, 443 F.3d 1362, 1367 (11th Cir. 2006).  But see

**Ground Three**

Petitioner contends that he was deprived of effective assistance of counsel because his lawyer did not object to allowing a videotape (of the police interview of C.H.) to go to the jury room during deliberations.  The trial court rejected this claim, holding that under Florida law, "properly admitted evidence must go to the jury, and this evidence had been entered properly, over the objection of the Defendant's counsel." Ex. N and P.

The state court erred as to state law.  Had Petitioner's attorney objected, either the videotape would not have gone to the jury, or if it had over his objection, the conviction might have been reversed and remanded for a new trial.  Young v. State, 645 So. 2d 965 (Fla. 1994).   Young reasoned:  "By permitting the jurors to see the [video] interview once again in the jury room, there is a real danger that the child's statements will be unfairly given more emphasis than other testimony."  645 So. 2d at 967.  Since an objection had been made, and since the error was not harmless, the Court in Young

---

Bockting v. Bayer, 399 F.3d 1010 (9th Cir. 2005), *cert. granted sub nom.* Whorton v. Bockting, 126 S.Ct. 2017 (May 15, 2006).  Further, it could not have been error for Petitioner's attorney to fail to foresee that Crawford would be decided.  Love v. Dretke, 416 F.3d 372, 380 (5th Cir. 2005).  Strickland said that in judging counsel's alleged deficient performance, "every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  466 U.S. at 689, 104 S.Ct. at 2065.  "In this circuit, we have a wall of binding precedent that shuts out any contention that an attorney's failure to anticipate a change in the law constitutes ineffective assistance of counsel."  United States v. Ardley, 273 F.3d 991, 993 (11th Cir. 2001) (Carnes, J., concurring) (cases cited omitted), *denying rehearing en banc in*, United States v. Ardley, 242 F.3d 989, (11th Cir. 2001), *cert. denied*, 535 U.S. 979 (2002).

v. State remanded for a new trial.  *Id.*, at 968.  *Accord*, Tullis v. State, 716 So. 2d 819

(Fla. 5th DCA 1998).

An objection by counsel was necessary to preserve the claim on appeal.  Jassan

v. State, 749 So. 2d 511, 512 (Fla. 2d DCA 1999) (not fundamental error and will not be

reviewed absent a trial objection).  *Cf.* Janson v. State, 730 So. 2d 734 (Fla. 5th DCA

1999), *review denied*, 767 So. 2d 457 (Fla. 2000) (letting jury have transcript of two

witnesses was not fundamental error).  But the fact that an objection would have been

sustained does not, by itself, demonstrate attorney error or prejudice to the outcome as

defined by Strickland.  It is, of course, a necessary beginning for proof of an

ineffectiveness claim.

Petitioner contends in a separate motion that a copy of a transcript of the

videotape is needed to enable him to prove prejudice to the outcome.  The better

evidence would be the videotape itself.  However, good cause for adding the videotape

to this record has not been shown.  Petitioner was at the trial and he saw the videotape.

He is capable of describing what it depicted.

Indeed, he has done so with respect to ground nine.  There, Petitioner asserts

that the investigating officer who took the videotaped statements from C.H., Officer

Rooney, asked leading questions, was overbearing, and C.H. said things that were

obviously wrong.  For example, C.H. said that he had known Petitioner for 40 years, that

he was dreaming, and that his mother was present when Petitioner came through the

window.

At trial, Petitioner's attorney argued that the videotape of the interview of C.H.

should not be admitted into evidence because C.H. said he was "in a dream."  Doc. 17,

Ex. C, p. 193.  He argued that C.H. was not responsive to certain questions, and in one case, "[t]hat answer obviously wasn't the correct answer."  *Id.*  He argued that C.H. would "waver back-and-forth between who came in, what was done, what wasn't done," and said he had known Petitioner for 40 years, which obviously was not true.  *Id.*  He pointed out that the investigator asked a leading question, "well, did he touch you on our pee pee?," and got an apparently fanciful response, "They called Mom when Wayne was in the room.  Mom came in the room and told Wayne to get out."  *Id.*  Counsel argued, therefore, that the videotape should not be allowed into evidence because it was "riddled with inconsistencies."  *Id.*, p. 194.  He asserted that the investigator's questions did not have to be leading:  "there doesn't need to be an atmosphere of asking the question again if you don't like the answer."   *Id.*  Counsel concluded: "You don't want to badger a child, but there is a way to do it and not do it and I suggest that the way in the video was not the way to do it."  *Id.*, p. 195.  The trial record, therefore, adequately describes the contents of this videotape.

It might be a different claim if the statements of C.H. on the videotape had been the only damaging evidence, or if the trial testimony of C.H. had been weaker than the accusations on the videotape.  But here, as described by both Petitioner and his trial attorney, it is the other way around.  The videotape provided evidence that C.H. had been asked leading questions by the officer and mixed reality with imagination.  This was useful to the defense.  Petitioner's attorney might have concluded that letting the jury have the videotape would help discredit C.H.'s trial testimony.  It cannot be said that no competent counsel would have failed to object.

Moreover, in context the videotape could not have been central to the jury's deliberation.  The jury had significant other corroborative evidence:  the hearsay statement of S.H., Petitioner's boot print high on the siding, Petitioner's fingerprint on the window, the tear in the screen, the close proximity of Petitioner's residence, and the DNA in C.H.'s underwear that matched Petitioner's DNA, having a probability of only 1 in 149 that it was left by someone else.  It is unlikely that the videotape in the jury room had much of an impact upon the verdict, and might even have been somewhat helpful to the defense.  Neither professional error or prejudice to the outcome has been shown.  Therefore, the state court's adjudication of the merits of this federal claim has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Four**

Petitioner contends his attorney was ineffective because he failed to object to the failure of the prosecution to give the requisite statutory 10 days notice of intent to use the hearsay statements of the victim, C.H.  The statute provides:

> In a criminal action, the defendant shall be notified no later than 10 days before trial that a statement which qualifies as a hearsay exception pursuant to this subsection will be offered as evidence at trial.  The notice shall include a written statement of the content of the child's statement, the time at which the statement was made, the circumstances surrounding the statement which indicate its reliability, and such other particulars as necessary to provide full disclosure of the statement.

FLA. STAT. § 90.803(23)(b).  Petitioner faults his attorney for not asking the trial court for a hearing to determine whether he was prejudiced by the prosecutor's discovery error.  Petitioner also argues that a statement by V.H., the mother of C.H., that C.H. said

"Wayne came in my window," should have been disclosed by the prosecution in advance.  Petitioner argues that in ruling upon the Rule 3.850 motion, the court addressed this claim as a hearsay statement from S.H., for which he concedes there was adequate 10 day notice, but contends that the court failed to address the remainder of this claim as to statements by C.H. and V.H..  Confusingly, Petitioner also seems to bring this as a *Brady*[5] claim.

The trial court denied this claim, finding that the notice required by statute was given.  Doc. 17, Exs. N and P.  Respondent likewise argues that the prosecution did file the "requite [sic] notice, (E-75)."  Doc. 19, p. 19.  There is no page 75 to exhibit E, but there is a notice that is page 75 to exhibit L (State's response to the Rule 3.850 motion).  That gave notice only as to hearsay statements by a minor, M.S.S., who Petitioner asserts is the same person as S.H.  That notice does not address Petitioner's claim as to hearsay statements by C.H. and V.H.

Respondent asserts that "defense counsel was no doubt aware of the evidence anyway."  The trial court did not hold an evidentiary hearing, and therefore, a determination of fact of this sort cannot be made by this court without an evidentiary hearing.

Respondent argues that this claim is only an issue of state law.  That is not true.  Petitioner argues ineffective assistance of counsel.

But there is no need to clarify the record as to whether notice was given (as found by the trial court) or hold an evidentiary hearing because the claim is conclusory,

---

[5] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

without supporting allegations.  "A convicted defendant making a claim of ineffective

assistance of counsel must identify the acts or omissions of counsel that are alleged not

to have been the result of reasonable professional judgment."  Strickland, 466 U.S. at

690, 104 S.Ct. at 2066.  "Conclusory allegations of ineffective assistance are

insufficient."  Wilson v. United States, 962 F.2d 996, 998 (11th Cir. 1992) (drug quantity

at sentencing, failure to allege specific facts), *quoting*, United States v. Lawson, 947

F.2d 849, 853 (7th Cir. 1991) (same); Aldrich v. Wainwright, 777 F.2d 630, 636-37 (11th

Cir. 1985), *cert. denied*, 479 U.S. 918 (1986) (defendant's conclusory allegations about

the testimony of uncalled witnesses are insufficient to state a claim of ineffective

assistance of counsel); Bolder v. Armontrout, 921 F.2d 1359, 1363-1364 (8th Cir. 1990),

*cert. denied*, 502 U.S. 850 (1991); United States v. Vargas, 920 F.2d 167, 169-170 (2d

Cir. 1990), *cert. denied*, 502 U.S. 826 (1991).

The premise of ground four is that had Petitioner's attorney had notice of these

particular hearsay statements, he would have been able to do something different about

them and the outcome probably would have been different.  Petitioner does not allege

what his attorney might have done differently.  He seeks to remedy this by arguing that

had the court held a *Richardson*[6] hearing, he would be in a better position to set forth

_____

[6] Richardson v. State, 246 So. 2d 771 (Fla.1971).  "*Richardson* states that
although the trial court has discretion in determining whether the state's noncompliance
with the discovery rules resulted in harm or prejudice to the defendant, such discretion
could be exercised only after the court made an adequate inquiry into all of the
surrounding circumstances.  At a minimum the scope of this inquiry should cover such
questions as whether the state's violation was inadvertent or willful, whether the
violation was trivial or substantial, and, most importantly, whether the violation affected
the defendant's ability to prepare for trial."  State v. Hall, 509 So. 2d 1093, 1096
(Fla.1987).

the prejudice that he suffered.  Petitioner, however, has been through the trial and has

the advantage of hindsight.  If there had been prejudice to his defense, he surely could

identify it by now.  Ground four fails to state a claim of ineffective assistance of counsel.

Likewise, a *Brady* claim has not been adequately alleged.  "A <u>Brady</u> claim is

available if either exculpatory or impeachment evidence is suppressed, regardless of

the good faith or bad faith of the prosecution." <u>United States v. Fernandez</u>, 136 F.3d

1434, 1438 (11th Cir. 1998).  To show a *Brady* violation, Defendant must show (1) that

the prosecution possessed material evidence favorable to the accused (including

impeachment evidence), (2) that Defendant did not have the evidence and could not

have obtained it through the exercise of due diligence, (3) that the prosecution

suppressed the evidence, and (4) that a reasonable probability exists that the outcome

would have been different had the evidence been disclosed. <u>United States v. Meros</u>,

866 F.2d 1304, 1309 (11th Cir. 1989), *cert. denied*, 493 U.S. 932 (1989) (citations

omitted).  Defendant has not shown any evidence remotely favorable to his defense

which was withheld by the prosecution, and his claim fails at step one.  Ground four is

without merit.

**Ground Five**

Petitioner contends his attorney was ineffective because he did not object when

V.H., the mother of the child victim, expressed her opinion that her son was not a liar

and would not lie about "something like that."  V.H. had first related what C.H. had told

her about the sexual assault upon him by Petitioner.  The following colloquy next took

place between the prosecutor and V.H.:

       Q     Okay.  And did you call the police?

A Yes, sir.

Q Did you have any reason to disbelieve what [C.H.] had told you?

A No, sir.

Q Has [C.H.] ever lied before?

A *He's not, he's not a liar.  He's not and he wouldn't lie about something like that.*

Q Has he lied though?

A Yes.

Q Told stories?

A Yes.

Q Anything about anything serious or ever accused anybody of ever doing anything serious?

A No, sir.

Doc. 17, Ex. C, p. 274.

The state court denied this claim.  That court found that "the defense had put into issue the claim that the victim was not being truthful.  The testimony of the victim's mother was admissible to address the defense claim of lack of truthfulness on the part of the victim."  Exs. N and P.

The testimony of C.H. preceded this testimony by V.H.  Respondent contends that the credibility of C.H. had been at issue on cross examination of C.H. by Petitioner's attorney.  Doc. 19, p. 19.  Respondent asserts that *defense* counsel asked C.H. "Okay, you're positive you're telling us the truth; is that right?"  *Id.*  This is not correct.  The question was by the prosecutor on redirect of C.H.  Doc. 17, Ex. C, pp. 262-263.  Petitioner's attorney did not directly challenge the truthfulness of C.H. on cross

examination.  He only explored the ability of C.H. to respond to questions and to

remember.  *Id.*, pp. 258-262.  Still, it is true that the credibility of C.H. was central to this

case.

The opinion of V.H. as to the truthfulness of C.H. was probably error under

Florida law.  Smith v. State, 674 So. 2d 791 (Fla. 5th DCA), *review denied*, 684 So. 2d

1352 (1996); Paul v. State, 790 So. 2d 508 (Fla. 5th DCA 2001); Tingle v. State, 536

So. 2d 202 (Fla. 1988); Weatherford v. State, 561 So. 2d 629 (Fla. 1st DCA 1990).

Such error, in an appropriate case, may amount to a denial of due process.  Snowden v.

Singletary, 135 F.3d 732 (11th Cir.), *cert. denied*, 525 U.S. 963 (1998).  But that is not

the claim here.  The claim here is that counsel was ineffective for failing to object.

It is not clear, however, that there was attorney error.  Sometimes an objection is

tactically unwise, especially where sympathy for the victim and his family is likely.  In

this instance, the answers obtained were not terribly damaging.  The prosecutor was

forced to establish that C.H. had lied previously to his mother, thus immediately

undercutting her assertion that "he's not a liar."  Further, testimony of this sort was

probably taken with some skepticism by the jury.  Mothers do not like to think that their

children lie, but the jury nonetheless probably understood that children are not always

truthful.  Further, the opinion of V.H. that C.H. would not falsely accuse someone else of

serious wrongdoing was probably viewed by the jury with skepticism, as something that

a parent might avow without really having a sufficient basis for the opinion.

Moreover, prejudice to the outcome has not been shown.  In the context of all of

the other evidence at trial, had an objection been lodged and sustained, the outcome

probably would have been the same.  The opinion of V.H. as to the truthfulness of C.H.

was of little consequence, given the strong corroborative evidence.  Consequently, the state court's denial of this claim has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Six**

Petitioner contends that his attorney was ineffective for failing to call M.S., the father of C.H. and owner of the residence, to testify at trial.  Petitioner alleges that in a deposition, M.S. had said that about a month before the offense occurred, he opened the window to the bedroom of C.H. and S. H. to air it out, and he said "that one window that was opened, that Wayne came through, it wouldn't come up then so I know that somebody had to pry that window up."  Doc. 28, p. 5g; doc. 28, p. 16 (pagination on the electronic docket).  Petitioner reasons that he could not have gone through a window that was stuck and could not be opened.  *Id.*, p. 5h; Doc. 18, p. 17.  He points out that Officer Rooney testified that there were "no obvious signs of damage or tampering with the window."  *Id.*

The trial court rejected the claim, finding that there was no evidence as to when M.S. lived in the residence or when the window was stuck.  Doc. 17, Exs. N and P.  The court also held:  "If there had been testimony at trial that the window was stuck at some time and was pried open later, there is not a reasonable certainty that the jury would have found differently."  *Id.*

Respondent admits that this deposition is not in the record before this court, doc. 19, p. 20, but Petitioner quotes from it and M.S. plainly said that he tried to open the window "about a month before any of this happened."  Doc. 28, p. 5g; doc. 28, p. 16.

The deposition is not in this record.  It will be assumed that Petitioner's assertions as to what is in the deposition are correct and that M.S. would have testified that about a month before the incident with Petitioner, he noticed that the window was stuck in the closed position.

Petitioner argues that the trial court misapplied <u>Strickland</u>.  It is true that under <u>Strickland</u>, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 694, 104 S.Ct. at 2068.  He does not have to prove a "reasonable certainty" that the outcome would have been different.  Thus, the state court misstated the <u>Strickland</u> standard.

Respondent also argues that the decision not to call M.S. as a witness was a strategic decision by counsel.  Doc. 19, p. 20.  That the window was stuck and M.S. could not open it a month before was potentially, if marginally, relevant.  However, it is possible that counsel did not call M.S. as a witness as he would then have been available to the prosecution to put into evidence that C.H. had told him he (C.H.) had seen Petitioner peering into the same bedroom window three days earlier.  See the discussion of ground seven, ahead.

But the probative value of testimony that the window was stuck a month earlier was only slight.  The trial evidence did not touch upon whether the window was stuck in any way.  There apparently were no pry marks.  Officer Rooney testified that he inspected the window, finding it to be closed without "any obvious signs of damage or tampering . . . ."  Doc. 17, Ex. C, p. 308.  Officer Andrews testified that the screening over the window was torn, there was a shoe track underneath the window on the siding,

and there was a chair underneath the window.  *Id.*, pp. 282-283.  There was also a fingerprint on the bottom pane on the lower left side.  *Id.*, pp. 286, 290, 313.  The fingerprint, boot print, tear, and chair all directly showed that someone tried to get in the window, and the matching of the boot print and fingerprint proved that it was Petitioner who had been outside the window trying to get in.  The matching DNA in the underwear of C.H. proved that Petitioner had been in the bedroom of C.H.  That the window had been stuck a month earlier would have done little to erode this unfavorable evidence.

In summary, neither attorney error nor prejudice to the outcome has been shown.  Thus, the state court's rejection of this claim has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Seven**

Petitioner claims that his attorney should have been able to keep the fingerprint evidence from the jury.  He argues that the fingerprint evidence could have been excluded because the State had no evidence as to when the print was placed on the window.  He also argues that the fingerprint could have been left days before because M.S. testified in his deposition that C.H. said that at night, about three days earlier, Petitioner had been looking in his window.  Doc. 28, p. 5m; p. 22.  Petitioner argues that this evidence would have shown that his fingerprint was placed on the window three days earlier, not on the night of the assault.

The trial court held that the "fact that Defendant can come up with an alternate reason for the existence of fingerprints on the victim[']s window does not mean that the result of the trial would have been different."  Doc. 17, Exs. N and P.  Respondent

presents argument about a *shoe* print, which may be a scrivener's error, but missing the gist of the claim altogether.  Doc. 19, p. 21.

There is law in Florida requiring a relevant temporal connection between the offense and fingerprint evidence:

> The law is clear that, where fingerprint evidence is relied upon to establish that the defendant committed the crime, the circumstances must be such that the print could have been made only at the time the crime was committed.  Tirko v. State, 138 So.2d 388, 389 (Fla.3d DCA 1962). "Where the *sole* evidence linking a defendant to the crime is fingerprints found in a place or on a thing accessible to the general public and there is no other evidence to show that the prints were made at the time of the crime, *see, e.g., Williams v. State*, 247 So.2d 425 (Fla. 1971), courts must conclude that a defendant is entitled to a judgment of acquittal." *Sorey v. State*, 419 So.2d 810, 812 (Fla.3d DCA 1982).

Miles v. State, 466 So. 2d 239, 239-240 (Fla. 1st DCA 1984) (emphasis added), *petition for review denied sub nom.* State v. Hampton, 476 So. 2d 675 (Fla. 1985).

This rule does not govern the *admissibility* of fingerprint evidence, however.  It only concerns the sufficiency of such evidence for a conviction.  Further, the rule applies only when the State "relies *solely* upon fingerprint evidence to establish a defendant's guilt."  K. S. v. State, 814 So. 2d 1190, 1192 (Fla. 5th DCA 2002) (emphasis added). The State did not rely solely upon fingerprint evidence here.  There was the testimony of C.H., the boot print, and DNA evidence.

Further, a necessary premise of this rule is that the fingerprint was found in a place accessible to the general public.  Generally speaking, a bedroom window of a detached home is not a place accessible to the general public.  *See* Walker v. State, 656 So. 2d 950, 950-951 (Fla. 5th DCA 1995) (backyard bedroom window).  The bedroom window here was either at the side or front of the mobile home, but the

fingerprint in this case was found at the eye level of a six foot officer.  Doc. 17, Ex. C.,

pp. 267, 318-319.  *See* K. S. v. State, 814 So. 2d at 1193 (fingerprint over seven feet off

the ground on a window was "clearly not a place a casual passerby would likely leave a

fingerprint.").  There was no evidence at trial that this bedroom window, especially six

feet off the ground, was "accessible to the public."  None of this was useful to

Petitioner's defense, and his attorney cannot be faulted for having not argued these

legal points.  Petitioner presents no law to show that the fingerprint evidence should

have been inadmissible.

Moreover, the argument that Petitioner's attorney should have called M.S. to

place in evidence the statement of C.H. that at night, three days, Petitioner had been

peering into this bedroom window earlier is illogical.  To portray Petitioner as a "peeping

Tom," looking at the two young boys in their bedroom at night just three days before,

would have been very unhelpful to the defense.  Ground seven is without merit.

**Ground Eight**

Petitioner argues ineffectiveness because his attorney failed to object to

"prosecutorial misconduct" in closing argument.  The closing statements that he has

identified as objectionable are in the following portion that commences with the opening

of the argument.  The parts at issue are emphasized in italics:

> Folks, two young boys lost their innocence.  Their rights were violated in
> the sanctity of their own home.  And it was done for one reason, to satisfy
> the criminal needs and desires of the defendant and that's why we're here.
>
> A little four-year old boy, little [C.H.], due to *his bravery and honesty and
> innocence* that only a four-year-old boy or girl could have begun the
> process that brought the defendant to justice and that's why we're here.

> Those dreaded words [C.H.] spoke, *dreaded by everybody that their child had been molested*, came that early morning, that early Sunday morning on the 17th of January that Wayne came in his window and sucked on his pee pee that night.
>
> Those are childlike terms.  He didn't come in and say David Wayne Pridgeon came in and had oral sex with me.  Those were childlike terms, terms that only a four-year-old or a child that age or close to that age would even conceive of using.
>
> And if you'll recall throughout the questioning, throughout the rigors that this system had to put him through, throughout the interviews that he had to face, throughout the examinations in the doctor's office, and throughout the videotaping that he went through, and throughout the most traumatic thing that could ever, I submit to you, happen to a little boy, having to get up here and talk to six or eight people and others he didn't know about a very sensitive thing, and, again, he said the same thing, the same thing.

Doc. 17, Ex. C, pp. 503-504 (emphasis added).  Petitioner argues that it was inappropriate to ask the jurors to imagine that their child had been molested and to express an opinion as to the honesty and innocence of C.H.

Petitioner also asserts that his attorney should have objected when the prosecutor argued that there was no evidence that someone other than Petitioner had kicked the siding of the mobile home, leaving a boot print.  Petitioner's counsel had first made an argument that the boot print on the siding of the mobile home was latent, that is, it could not be seen.  *Id.*, p. 499.  He argued that the print was not consistent with someone climbing into the window.  *Id.*  In response, the prosecutor argued:

> Mr. Hargrove [Petitioner's attorney] made a point is that consistent with somebody doing that?  Well, look how high it is up on the trailer. [Officer] Rooney said that he was six foot maybe or somewhere thereabouts.  Look where it is and let's start talking about coincidence versus hard, cold evidence.  Consistent with someone walking up and kicking it?  Why?  *We didn't hear any evidence as to why that would even take place.*

*Id.*, p. 513.

The trial court rejected this claim, finding that counsel's failure to object did not rise to the level of ineffective assistance of counsel.  Doc. 17, Exs. N and P.

The purpose of closing argument under Florida law is to review the evidence with the jury and to argue inferences that may be drawn from the evidence:

> The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.  Conversely, it must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.

Bertolotti v. State, 476 So. 2d 130, 134 (Fla. 1985); Dessaure v. State, 891 So. 2d 455, 468 (Fla. 2004).  It is well-established, however, that argument may be made as to questions of credibility from the trial evidence, including credibility as revealed by the demeanor of a witness.  Watkins v. Sims, 81 Fla. 730, 741, 88 So. 764, 767 (Fla. 1921).

With the exception of the statement about words "dreaded by everybody that their child had been molested," the prosecutor's arguments were fair comment on the evidence.  The central evidence was the testimony of C.H.  The jury had the option of seeing the testimony of C.H. as the product of honesty and bravery, or as the imagined events of a very young child.  Petitioner's attorney had just argued that C.H.'s answers depended upon how many times he was asked the question, implying that the answers C.H. gave were the product of overbearing and suggestion.[7]  Id., pp. 500-502.  In context, the depiction of C.H. as "honest and brave" was simply the introduction to the prosecutor's argument that C.H.'s testimony was credible because it had remained

---

[7] Petitioner's attorney had the first closing argument.

consistent through several interviews, despite the fact that it was probably a difficult and lengthy process for him.

Likewise, the comment about how the footprint came to be on the siding of the mobile home was fair comment on the evidence.  It did not improperly shift the burden of proof to Petitioner, nor was it a comment on Petitioner's decision not to testify.  It was only a comment on the evidence that existed, including the lack of evidence that someone might have come along casually and left a footprint that high on the siding.

While the statement about words "dreaded by everybody that their child had been molested" was probably improper because was aimed at invoking sympathy for the mother of C.H., an objection would have done more damage than good.  While the jury might have understood an objection to be an appeal to reason rather than to sympathy and emotion, it more likely would have done the opposite, bringing unwanted attention to the feelings of V.H. and the jury's own feelings about an offense of this sort. *Cf*. United States v. Wilson, 149 F.3d 1298, 1301, n. 5 (11th Cir. 1998) ("mindful of a defense counsel's dilemma" that "[o]bjections may also serve to draw unwanted and unnecessary attention" to prosecutor's improper comments); Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S.Ct. 1, 4, 157 L.Ed.2d 1 (2003) (per curiam) (noting, in context of alleged ineffectiveness for failing to make certain arguments in closing, that "deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage," and "[j]udicial review of a defense attorney's summation is therefore highly deferential – and doubly deferential when it is conducted through the lens of federal habeas.").

Further, the prosecutor did not make this comment the centerpiece of his closing argument.  Instead, he argued from the evidence as to why the charge had been proven.  Consequently, Petitioner has not shown that the state court's adjudication of ground eight has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Nine**

Petitioner contends that his *appellate* attorney was ineffective for not raising as error on direct appeal the admission into evidence of the videotaped statements by C.H. Petitioner argues that the foundation for admission of these hearsay statements required by FLA. STAT. § 90.803(23) did not exist.  Petitioner argues that his attorney should have argued that the videotape should not have been in evidence because Officer Rooney asked leading questions during the interview, was overbearing, and several of the child's responses seemed to be products of his imagination.  Petitioner also faults his attorney for failing to have this videotaped interview made a part of the appellate record.  He argues that his appellate attorney could not have made a reasonable decision concerning whether to raise this issue on appeal if he did not have before him either the videotape or a transcript of the interview.

Ineffective assistance of appellate counsel claims are analyzed under the test enunciated in <u>Strickland v. Washington</u>.  <u>Grubbs v. Singletary</u>, 120 F.3d 1174, 1176 (11th Cir. 1997); <u>Heath v. Jones</u>, 941 F.2d 1126, 1130 (11th Cir. 1991), *cert. denied*, 502 U.S. 1077 (1992).  With regard to attorney error, appellate counsel need not raise every nonfrivolous issue.  <u>Jones v. Barnes</u>, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d

987 (1983).  "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."  463 U.S. at 751-752, 103 S.Ct. at 3313.  The "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  Smith v. Murray, 477 U.S. 527, 536, 106 S.Ct. 2661, 2667 (quoting Barnes).  "Notwithstanding *Barnes*, it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent. *See, e.g., Gray v. Greer*, 800 F.2d 644, 646 (C.A.7 1986) ('Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome')." Smith v. Robbins, 528 U.S. 259, 288, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000).  *See also* Bundy v. Dugger, 850 F.2d 1402, 1411 (11th Cir. 1988), *cert. denied,* 488 U.S. 1034 (1989) (discussing Strickland, and Barnes).

To determine prejudice, the court reviews the merits of the omitted or poorly presented claim, and will find prejudice only where the claim would have a reasonable probability of success on appeal.  Heath v. Jones, 941 F.2d at 1136.

As noted above, Petitioner's trial attorney made a number of arguments that the hearsay statements of C.H. on the videotape were unreliable.  Doc. 17, Ex. C, pp. 193-195.  The trial court rejected these objections.  The trial judge found that although it would have been better to have a properly trained person to interview C.H., no one was

available then (a weekend or a holiday),[8] so the officers had to do it themselves.  *Id.*, p.

196.  He found that the interviewing officer was "very calm in his questioning the child,

obviously got a rapport."  *Id.*  He thought that C.H. "sort of teased back at the officer

phrasing of his answer to his questions," and found that C.H. was not afraid of anyone.

*Id.*, pp. 196-197.  He found that while there were some leading questions, the question

"were not overly pointed and leading."  *Id.*, p 197.  The court thought that the content of

C.H.'s testimony was "to the point."  *Id.*  The court said: "I mean a lot of things he said

during the interview may not have been, but when it came down to the case at hand he

was very positive about that."  *Id.*  The court concluded that the "circumstances lead to

reliability as well as being trustworthy."[9]  *Id.*

> Respondent's defense to this claim is that
>
> there were no grounds to raise this issue on appeal.  As already stated,
> over defense counsel's objections, the videotape was ruled reliable by the
> trial judge and the child was deemed competent to testify.  The child was
> at trial for cross-examination and there were no confrontation violation
> rights.

Doc. 19, p. 23.

Respondent is correct.  The admissibility of the videotape of the interview with

C.H. was a weak appellate issue.  The trial court had properly found C.H. to be

---

[8] The interview was conducted on January 17, 1999.  Doc. 17, Ex. C, p. 153.  It is judicially noted that January 17th was Sunday.  January 18th was the Martin Luther King holiday.

[9] This current claim, that appellate counsel was ineffective for failing to raise this issue on appeal, was presented in a petition for writ of habeas corpus in the First District Court of Appeal.  In that petition, Petitioner reargued the points that his trial attorney had raised above.  Doc. 17, Ex. J, petition, p. 6.  The claim was denied without an opinion. Doc. 17, Ex. J.

competent to testify as discussed with respect to ground one.  Unlike the situation with

the hearsay statements of S.H., C.H. testified and was available for cross examination.

If the testimony of C.H. on the videotape was vague, confused, or the apparent product

of leading questions and overbearing by the investigator, as was argued by Petitioner's

trial attorney, that would have been helpful to the defense as it would undermine the trial

testimony of C.H.  Appellate lawyers have to focus on the best arguments and leave out

weak ones.  Ineffective assistance of appellate counsel has not been shown as to

ground nine.  Therefore, the state court's adjudication of this claim has not "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States."  §

2254(d)(1).

**Ground Ten**

Petitioner contends that he was denied a fair trial in violation of due process and

his right to confront the witness when the trial court permitted Dr. Dulay, a pediatrician,

to testify as to statements made to her at the hospital by C.H.  Dr. Dulay testified that on

Sunday afternoon, January 17, 1999, she was called into work to examine two children.

Doc. 17, Ex. C, p. 377.  Dr. Dulay performed a sexual assault examination upon C.H.

and the other child.  *Id.*  She testified that C.H. told her:  "Wayne came through his

window when it was dark and sucked my pee pee.  He also let me suck his pee pee."

*Id.*

This claim was raised on direct appeal as a due process claim, not as a

Confrontation Clause claim.  Doc. 17, Ex. F (initial brief on appeal), pp. 17-24.

Although only state law was mentioned, Respondent has addressed the merits.

However, since state court remedies were not exhausted as to a Confrontation Clause claim, Petitioner must show cause and prejudice for his default.  He has not done so, and therefore the only claim properly before this court is a federal due process claim.[10]

Judge Ervin, concurring, found admission of the statements to Dr. Dulay to be error under FLA. STAT. § 90.803(4), but found the error harmless because similar testimony was properly admitted through FLA. STAT. § 90.803(23).  Doc. 17, Ex. I. Judge Ervin cited State v. Jones, 625 So. 2d 821 (Fla. 1993).  Id.

Petitioner argues that the error was not harmless since Dr. Dulay would have been viewed by the jury as more credible than the interrogating police officers, and her repetition of C.H.'s accusations against Petitioner added significant weight to the evidence against him simply due to her status as a pediatrician trained in interviewing and obtaining truth from children.

Respondent's argument in defense is the following:

The trial court admitted the statement under the hearsay exception for medical diagnosis. (§ 90.803(4), Fla. Stat.)  However, on appeal, the First DCA, said that the statement was not admissible under that exception, but

---

[10] Respondent cannot be deemed to have waived the exhaustion requirement unless it expressly waives it.  28 U.S.C. § 2254(b)(3).  Prior to the passage of the AEDPA, this circuit had held that a district court could consider the issue of procedural default on its own motion, given the interests in comity.   Esslinger v. Davis, 44 F.3d 1515, 1524-25 (11th Cir.1995).  Ten circuits, including the Eleventh Circuit, agree on this point, and five circuits so decided after the AEDPA was enacted.  King v. Kemna, 266 F.3d 816 (8th Cir. 2001), cert. denied, 122 S.Ct. 1311 (2002), citing Yeatts v. Angelone, 166 F.3d 255, 261-62 (4th Cir.1999) (collecting cases).  There is now another reason, in addition to comity, to address exhaustion as this court cannot grant relief unless "the state court's decision was contrary to . . . clearly established Federal law." 28 U.S.C. § 2254(d)(1).  If the state court was never presented with the claim, there could not have been a state court decision, and this court could not find that its decision was contrary to clearly established law.

it was harmless because similar statements were admissible under § 90.803(23), Fla. Stat., the child hearsay statement exception.

The First DCA was correct, the child victim consistently stated that Wayne came through his window and touched his "pee pee".   He said it on video with the police office, he said it to his mother, and he said it when he testified live at the trial.   Therefore, his trial counsel effectively raised the objection at trial, it was considered on appeal, and he lost.   Moreover, the appellate court itself concluded that Petitioner was not prejudiced by the statements of Dr. Dulay because similar statements were admissible under other hearsay exceptions.

Doc. 19, p. 24.

An error of state law in the admission or exclusion of evidence is not, standing alone, a violation of due process.   Thigpen v. Thigpen, 926 F.2d 1003, 1011 (11th Cir. 1991).   "[I]f a state trial judge erroneously admitted evidence in violation of a state law and the error made the petitioner's trial so fundamentally unfair that the conviction was obtained in violation of the due process clause of the fourteenth amendment," habeas relief is available.   Id., 926 F.2d at 1012.   "An erroneous evidentiary ruling creates such fundamental unfairness when the wrongfully admitted evidence is 'material in the sense of a crucial, critical, highly significant factor.' "   Id., citations omitted.

In this case, the statements to Dr. Dulay probably could have been admitted as a hearsay exception pursuant to FLA. STAT. § 90.803(23).   State v. Jones, 625 So. 2d at 826.   The predicate for admission of the statements would have been established as the statements to Dr. Dulay by C.H. were exactly the same as his statements on the videotape, which were admitted pursuant to § 90.803(23).   Further, Dr. Dulay's repetition of statements made by C.H. added little to the evidence against Petitioner. Fundamental unfairness has not been shown.   Consequently, the state court's adjudication of this claim has not "resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

**Ground Eleven**

Petitioner contends that his attorney was ineffective with respect to the testimony of Linda Livingston.  He also contends that admission of her testimony was a denial of due process.  Ms. Livingston was qualified as an expert in population frequency statistics, and she testified as to the meaning of DNA testing.  Petitioner argues that Ms. Livingston conceded that she did not have expertise as to the relevant database to determine that Petitioner might have been a donor to the mixed stain material found in the underwear of C.H.  Petitioner relies upon Murray v. State, 692 So. 2d 157 (Fla. 1997) in support of this claim.  The database that was used was supplied by Roche Molecular Systems.  Doc. 17, Ex. C, p. 405.  Petitioner also argues that Livingston was improperly qualified as an expert, and her testimony denied due process.  Petitioner contends he raised these claims on direct appeal.

On direct appeal, Petitioner presented only a state law claim.  Doc. 17, Ex. F, pp. 14-16, 25-30.  He did not argue denial of a fundamentally fair trial in violation of federal due process.  *Id*.  Respondent, however, has not argued exhaustion of state court remedies and addresses the merits.

The first step is to sort out the claim presented.  While Petitioner now mentions ineffective assistance of counsel, he did not raise a claim of ineffective assistance of his trial counsel as to the testimony of Ms. Livingston in his Rule 3.850 motion, and the trial court did not rule upon that claim of ineffectiveness.  Doc. 17, Exs. K, N and P.  Nor did Petitioner fault his appellate counsel in his petition for writ of habeas corpus as to the

way he argued the claim on direct appeal. *Id.*, Ex. J, p. 3. As pointed out by Respondent, Petitioner's attorney made many objections to the testimony of Ms. Livingston and cited Murray v. State. Doc. 17, Ex. C, pp. 409-415. Petitioner's claim in this court is simply to reiterate his trial attorney's objections, giving rise to the reasonable inference that he believes his attorney lodged effective objections and he does not claim ineffectiveness. Likewise, Respondent did not address the merits of an ineffective assistance of counsel claim, but responded only to the claim of trial error. Doc. 19, p. 25.

It must be assumed, therefore, that Petitioner did not intend to bring any sort of ineffective assistance of counsel claim in ground eleven. If he did, the claim is unexhausted and now procedurally barred. Since he has not shown cause for the default and prejudice, the court cannot reach the merits of an ineffectiveness claim.

Ground eleven, therefore, is a federal due process claim. Petitioner must show that admission of this evidence denied him a fundamentally fair trial.

The state law for the admission of this evidence was established in Murray v. State. In that case, the Florida Supreme Court said:

> Most recently, in *Brim v. State*, 22 Fla. L. Weekly S45, 695 So. 2d 268 [1997 WL 18239] (Fla. Jan. 16, 1997), we reaffirmed our adherence to the *Frye*[11] test for the admissibility of DNA evidence, and clarified that each stage of the DNA process, i.e., the methodology for determining DNA profiles, as well as the statistical calculations used to report the test results – both of which are at issue in the instant case – are subject to the *Frye* test.

---

[11] Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923). Florida has not adopted the federal standard set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). U.S. Sugar Corp. v. Henson, 823 So.2d 104, 106 (Fla. 2002).

692 So. 2d at 161.  Quoting from <u>Brim v. State</u>, 695 So. 2d 268 (Fla.), the court said:

> This second step of the DNA testing process does not rely upon principles of molecular biology or chemistry.  Instead, the calculation of population frequency statistics is based on principles of statistics and population genetics. Accordingly, calculation techniques used in determining and reporting DNA population frequencies must also satisfy the *Frye* test.
>
> *              *                *
>
> It is important to recognize, though, that DNA testing is a two-step process.  The fact that a match is found in the first step of the DNA testing process may be "meaningless" without qualitative or quantitative estimates demonstrating the significance of the match.  We acknowledge that arguments have been made that the statistics or population genetics used in calculating population frequency estimates are not new or novel scientific evidence and, consequently, should not be subjected to a *Frye* analysis.  We disagree.
>
> *              *                *
>
> In the absence of an independent validation method, we find that the *Frye* test is appropriate when using statistics or population genetics to calculate population frequency statistics.  Consequently, the techniques and methods utilized in both steps of the DNA testing process must satisfy the *Frye* test.

692 So. 2d at 162-163.

> The DNA expert in that case
>
> testified that his probability calculations were based on the Hellmith Study Manual, which was published by Cetus Corporation in 1989 or 1990; and were not founded upon any database generated by his own laboratory.  Nippes [the expert witness] could not testify as to how the Hellmith database had been created.  In fact, Nippes affirmatively admitted – both at the suppression hearing and at trial – that he had absolutely no knowledge of how the database he used in drawing his probability conclusions was assembled.

692 So. 2d at 160.

> The court found that:
>
> As we stated in *Jordan*,[12] it is not absolutely necessary for an expert witness to demonstrate practical experience in the field in which he will testify.  We are not

---

[12] <u>Jordan v. State</u>, 694 So. 2d 708 (Fla. 1997).

ruling that the expert in this case could only testify if he helped to assemble the
database.  We are finding, though, that this expert must, at the very least,
demonstrate a sufficient knowledge of the database grounded in the study of
authoritative sources.  Such a knowledge was not demonstrated.  In fact, this
expert had no insight into the assembly of the relevant database.

692 So. 2d at 164.  The court concluded that "this expert was simply not qualified to

report the population frequency statistics at issue here because the expert had no

knowledge about the database upon which his calculations were based."  *Id.*

In the initial proffer, Ms. Livingston testified that she had testified as an expert in

DNA twenty times and had never been found not qualified in that subject.  Doc. 17, Ex.

C, p. 401.  She had been trained by the Florida Department of Law Enforcement in the

Roche Molecular Systems process, which supplied the kit for her DNA typing.  *Id.*  Ms.

Livingston did the DNA typing on samples taken from Petitioner, C.H., and S.H.  *Id.*, p.

402.  She said that after typing, it was her conclusion that Petitioner and C.H. could be

"donors" of the DNA material submitted to her.  *Id.*, p. 403.  She said that a person other

than Petitioner could have contributed to the samples at a probability of 1 out of 149

Caucasians and 1 out of 2700 African Americans.  *Id.*  It is assumed that the statistic for

Caucasians is at issue here, as that was the issue argued on direct appeal.  Doc. 17,

Ex. F, p. 14.

Ms. Livingston said that to get these probabilities, she used the database

prepared by Roche Molecular Systems, consisting of samples from Lab Corporation

from people from throughout the United States.  *Id.*, pp. 403-404, 408.  This provided

the database from which she determined the frequencies described above.  *Id.*, p. 404.

She said that the Roche database is generally accepted.  *Id.*  On cross examination,

Ms. Livingston said that she had only a small amount of training in population genetics

and statistical population genetics.  *Id.*, pp. 404-405.  Ms. Livingston did not know how

many people contributed to the Roche database.  *Id.*, p. 405.  She said that the samples

used to compile the Roche database originated from Lab Corporation.  *Id.*  Lab

Corporation had collected the data for paternity testing and included racial designations.

*Id.*  Other than the reason for gathering the samples and the racial designations, she did

not know of any criteria used to include or exclude people from the database.  *Id.*, pp.

405-406.  Ms. Livingston said that the database had been analyzed by professors at the

University of California at Berkeley "to make sure it withstood the test of Hardy

Weinberg equilibrium and that it was, in fact, usable as a database."  *Id.*, p. 406.  Other

than that, she did not know what specific statistical tests were used to validate the

database.  *Id.*  She had not seen the raw data.  *Id.*, p. 408.  Ms. Livingston was aware of

a database that had been compiled for Florida populations only, but she did not use it.

*Id.*

　　　　Petitioner's attorney objected to testimony by Ms. Livingston, arguing that she

was not adequately qualified to render a statistical opinion related to population

frequencies.  *Id.*, p. 410.  The court had a copy of <u>Murray v. State</u>.  *Id.*  Petitioner's

attorney argued that Ms. Livingston did not have "sufficient knowledge of the data base

grounded in the study of authoritative sources."  *Id.*, p. 412.  He argued that Ms.

Livingston was in the same position as the expert found not qualified in <u>Murray v. State</u>,

who had only a manual to follow.  *Id.*

　　　　The court reasoned that the Roche database was accepted as authoritative, and

did not expect the Florida Department of Law Enforcement "to go out and take

nationwide samples."  *Id.*, p. 413.  Petitioner's attorney argued that there needed to be

"an understanding of the workings of how [Roche] did it right statistically.  And I think that's what's lacking here."  *Id.*, p. 414.  Ms. Livingston then reiterated that the Roche database had been examined at Berkeley "to determine that there were no linked genes, that there was in what's called Hardy Weinberg equilibrium, meaning that it's not skewed because of the way it was taken.  And they found that it was met [in] each of those tests."  *Id.*  The court overruled Petitioner's objections.  *Id.*, p. 415.

Both the trial court and state appellate court found no error of state law, applying Murray v. State.  Petitioner's federal claim is premised entirely upon Murray v. State. Indeed, Petitioner has not cited any clearly established federal law on the subject.

But whatever the federal claim may be, the distinction between the case at bar and Murray v. State is clear.  In Murray v. State, the expert "had absolutely no knowledge of how the database he used in drawing his probability conclusions was assembled."  692 So. 2d at 160.  Here, Ms. Livingston knew that the database had been assembled from paternity testing nationwide.  She knew that racial identifiers had been affixed to the data.  She knew that the database had been subjected to statistical analysis at the University of California at Berkeley and found to be acceptable.  There was no violation of state law.  Petitioner has not identified a federal case finding a violation of due process where expert testimony has been admitted at trial in compliance with state law under the circumstances presented here.  Nor has Petitioner shown that he was denied a fundamentally fair trial by the qualification of Ms. Livingston as an expert.  Consequently, Petitioner has not shown the state court's adjudication of this claim has "resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

**Ground Twelve**

Petitioner contends that he was denied effective assistance of counsel because his attorney failed to call Dr. Litman, a DNA expert, to rebut the testimony of Ms. Livingston.  Dr. Litman was appointed by the trial court to assist in his defense.  Copies of Dr. Litman's report and related materials are attached to the amended petition, doc. 28, as Appendices A, B, and C.  Dr. Litman was not called as a defense witness.

Petitioner first contends that his attorney was ineffective because he failed to obtain a copy of the determinations made by the state laboratory, using the outdated DQA1 and Polymarker test, even though Dr. Litman had said that obtaining a copy was "imperative."  He argues that had counsel had a copy of this report, he would have had a means to examine the determinations of the control, which provides the validation of signals implicating Petitioner.  He contends that his attorney could have then shown that the results were weak.

Second, Petitioner has provided as attachment B an email sent to counsel.  He contends that this email shows that Dr. Litman was of the opinion that Ms. Livingston had made biased assumptions when calculating probabilities.

Third, Petitioner contends that Dr. Litman could have established that only the Tallahassee office of the Florida Department of Law Enforcement (FDLE) will report statistical probabilities for a mixed stain, and that other FDLE offices do not.  Again, the email is cited in support of this claim.  He said that Ms. Livingston could have been

impeached as she testified that other laboratories reported on mixed stains, and Dr. Litman might have shown that reporting mixed stain frequencies was not reliable.

Finally, Petitioner asserts that Dr. Litman would have testified that the DNA test used by Ms. Livingston, known as the polymerase chain reaction (PCR) test, was outdated, and that a new test, short tandem repeat (STR) test, was available and could have been used.  He contends that Dr. Litman would have established that the PCR test was of limited probative value.

Dr. Litman's "report" is a letter to counsel dated April 19, 2000.  Doc. 28, Appendix A.  In the letter, Dr. Litman explains DNA testing in detail.  Dr. Litman said that it was "imperative" that counsel obtain color photocopies of the determinations because whether or not a blue dot formed was "the basis for evaluating the test."  *Id.*, p. 58; also doc. 28, App. A, p. 43 (the first page reference is provided by Petitioner; the second page reference is to the pagination on the electronic docket).

Dr. Litman explained that the PCR test involves only one segment of the DNA designated DQA1, "consisting of variations of genes that are important in tissue transplantation."  *Id.*, pp. 58-59; doc. 28, App. A, p. 41-42.  He said that PCR DNA testing is "extraordinarily sensitive; as little as 0.15 ng (nanograms – billionths of a gram) can be determined."  *Id.*, p. 60; p. 44.  He explained the meaning of the Hardy-Weinberg equilibrium.  *Id.*, p. 62; p. 46.  He explained that the frequency probabilities in populations by race using only the DQA1 (PCR) method resulted in broad expected frequency percentages, none of which standing alone was less than 15% of the total population by race.  *Id.*, p. 61; p. 45.

If a Polymarker calculation is made,[13] however, comparing DQA1 with 5 other markers, the frequency probability becomes much more refined.  In the example he gave, it would predict a frequency as small as one out of one thousand persons.  *Id.*, p. 62; p. 46.

Finally, Dr. Litman explained how the STR testing[14] could lead to expected frequencies as sensitive as one in one quadrillion.  *Id.*  He said that STR testing "carries enormous probative value" and "would eventually supplant conventional DNA typing methods."  *Id.*, p. 63; p. 47.  Dr. Litman also said that after the <u>Murray</u> case, " 'independent' population experts are engaged routinely to present statistical information at trial, as most of the FDLE personnel are not qualified to testify in this area."  *Id.*  Dr. Litman concluded:

> The analyses conducted in this case are interesting from several stand points.  First, I do not understand why DAQ1/polymarker, which is of limited probative value, was run on the evidence in this case; STR typing has been online since January, 1999 at most FDLE laboratories and has been conducted for years by private laboratories.  At least two other laboratories of FDLE do not report out statistics for mixed stains and it is unclear at this stage how the actual calculations were carried out.  Careful review of the FDLE operations manual is going to be critical in this case as will be full access to the laboratory benchnotes and other records.

*Id.*, p. 63; p. 47.

---

[13] Dr. Litman later explained in a FAX that Polymarker consists of 5 other distinct genetic markers, other than DQA1.  Doc. 28, Appendix C, p. 67; p. 51.  The Polymarker test examines the following genetic markers by abbreviations: LDLR, GYPA, HBGG, D7S8, and GC.  *Id.*, p. 61; p. 45.

[14] Dr. Litman said that STR (short tandem repeat) used 13 genetic markers.  Doc. 28, Appendix C, p. 67; p. 51.  *Id.*

In the email mentioned above, Dr. Litman explained the problems of obtaining statistical meaning from a mixed stain.  He said he thought that Ms. Livingston had assumed that C.H. was the contributor to part of the DNA, and that the test was to determine the unknown DNA.  *Id.*, p. 65; p. 49.  He explained, however, that each person carries two traits, and he gave an example of the victim carrying traits AB and the unknown being CD.  *Id.*  He explained that the assumption that AB was a contributor to the mixed stain could have been false, and that the sample might have contained contributions from individuals AC and BD.  *Id.*  Accounting for this, as he said the FBI does, dramatically increases the expected frequencies (and decreases the probative value of the test).  *Id.*  He suggested a series of questions to ask Ms. Livingston in cross examination to establish this point, including a question to establish that other FDLE laboratories do not present statistics for mixed stains.  *Id.*

Ms. Livingston testified that she used the PCR test combined with the five genetic markers of the Polymarker test.  Doc. 17, Ex. C, pp. 432-434.  She displayed her results to the jury, showing them the positive results represents by colored dots.  *Id.*, pp. 434-435.  She explained that the controls for the test also used other colored dots, and the colored dots for the controls in her testing showed that the results she had obtained were valid.  *Id.*, p. 435.  She explained that the DQA1 marker had two indicators, inherited from one's mother and father.  *Id.*, p. 436.  She said that if three types appeared on the strip, you knew that you had a mixture of the DNA from two or more people because no single person had more than two of the markers in the DAQ1 marker.  *Id.*  She said a mixture from at least two people was shown by her results.  *Id.*

Ms. Livingston compared the DNA of S.H. to the mixture and found that he could be eliminated.  His markers did not appear.  *Id.*, p. 437.  She said that the mixture indicated that C.H. contributed to the mixture because of the dot pattern.  *Id.*  She said that every dot in the control sample taken from C.H. matched the sample from the underwear of C.H.  *Id.*  She also said that every dot on the sample of DNA from Petitioner also matched the sample taken from the underwear.  *Id.*  Ms. Livingston then compared the other five markers, from the Polymarker test, and the same matching occurred.  *Id.*, pp. 437-438.  The conclusion was that the DNA found on the underwear could match both Petitioner and C.H., but could not include S.H.  *Id.*, p. 438.  Ms. Livingston assumed that you would expect to find someone's DNA in his or her own underwear.  *Id.*, p. 439.

The next step was to determine the probability that someone other than Petitioner contributed DNA to the sample from the underwear.  *Id.*, p. 439.  Ms. Livingston assumed that part of the DNA in the underwear was from C.H.  *Id.*  She said that the odds that someone other than Petitioner contributed the DNA in the mixture was 1 out of 149 for the Caucasian population.  *Id.*

On cross examination, Petitioner's attorney asked Ms. Livingston whether the ratio of 1 out of 149 was about 200 out of 3,000.  *Id.*, p. 440.  She said she did not know, but thought that was right.  *Id.*  The math was wrong, skewed in Petitioner's favor. The ratio is 20 out of 3,000.  Petitioner does not argue ineffectiveness from this error, however.

Counsel then established that the presence of saliva cannot be categorically identified.  It can only be indicated.  *Id.*, p. 443.  Ms. Livingston said that saliva was the most likely bodily fluid to be expected, based upon her experience.  *Id.*

Counsel also established that Ms. Livingston had assumed that one of the contributors to the underwear sample was C.H. and that there could have been more than one other contributor.  *Id.*, p. 444.  She admitted that if she had assumed that more than two (other than C.H.) had contributed, the probability that someone other than Petitioner had contributed DNA to the sample tested would have been much less than 1 in 149.  *Id.*

Counsel then examined Ms. Livingston as to her knowledge of STR testing.  *Id.* She said that the FDLE laboratory in Tallahassee had just started doing STR testing in November, 1999.  *Id.*, p. 445.  The trial was in June, 2000.  Ms. Livingston said that STR testing was not available for the testing done in this case.  *Id.*  Ms. Livingston said that STR testing is more specific (with respect to statistical correlations) because it looks at 13 genetic markers.  *Id.*  She admitted that at the time her laboratory in Tallahassee had done the testing in this case, FDLE laboratories in Orlando and Tampa were doing STR testing.  *Id.*  She admitted that the samples tested here could have been sent to Orlando or Tampa.  *Id.*, p. 446.  She admitted that STR testing was better suited for testing mixed stains.  *Id.*, p. 447.  Counsel established that the probabilities were derived from a national database.  *Id.*, p. 446.  On recross, counsel established that other FDLE laboratories calculate and report the probabilities for a mixed stain, but some do not use the Roche database.  *Id.*, pp. 450-451.

Finally, on redirect, Ms. Livingston said that the STR test is not more accurate than the tests she used since all of the tests produce accurate DNA typing. *Id.*, p. 448. She said that use of the national database was generally accepted in her field of expertise. *Id.*, p. 449.

In summary, all of Petitioner's concerns that form the basis for this claim of ineffective assistance of counsel were established by his attorney on cross examination of Ms. Livingston. Counsel had the testing results showing the colored dots, including the dots for the controls, and thus the "imperative" suggested by Dr. Litman was satisfied. He established through Ms. Livingston the assumption that C.H. was one of the contributors, an assumed bias, and the possibility that there were more than two contributors. He demonstrated that the PCR and Polymarker tests were outdated, if only by a few months, and that STR testing would have produced significantly reduced (refined) probabilities since more genetic markers would have been compared. He established that the FDLE laboratories in Orlando and Tampa perform STR testing. Dr. Litman was not needed as a witness for these evidentiary points because Ms. Livingston provided the evidence that Dr. Litman would have provided.

Moreover, Petitioner has not shown that STR testing would have been favorable. Since it is a more sensitive test, it might have shown a much greater probability that he alone contributed the DNA found in the underwear of C.H. Ineffective assistance of counsel has not been shown as to these aspects of this ineffectiveness claim.

The only matter not established through Ms. Livingston was whether or not other FDLE laboratories present frequency statistics for mixed stains. Dr. Litman indicated that perhaps they do not. Doc. 29, Appendix B, p. 65; p. 49. But Dr. Litman also

indicated that the FBI reports frequency statistics for mixed stains, albeit with refinements to the assumptions.  *Id.*  Thus, it cannot be assumed that Dr. Litman would have been able to establish that the other FDLE laboratories do not follow the same practice followed by the Tallahassee FDLE laboratory and the FBI.

In any case, Petitioner has not presented anything further from Dr. Litman on this particular point, and has not presented any cogent argument as to why some FDLE laboratory might not report statistical frequencies for mixed stains.  As Dr. Litman explained, the mathematics for mixed stains exists.  The result simply depends on assumptions as to how many contributors there were to the mixed stain, and whether it will be assumed that the alleged victim was a contributor.

Further, these arguments lose sight of the context of this evidence.  The DNA evidence had relevance at trial only with respect to the other evidence in the case. There was other strong evidence linking Petitioner to the offense described by C.H. C.H. gave a number of consistent statements describing the assault.  The assumption appropriate in this case arising from the trial evidence is that only two persons contributed to the DNA in the underwear of C.H., C.H. and someone else.  There was no evidence at trial that any third person might have left DNA in the underwear of C.H., and Petitioner has come forward with no such evidence.  It was reasonable to assume that DNA from C.H. was in his underwear.  There was no evidence that anyone else wore the underwear of C.H., as S.H. (his brother who shared the same bedroom) was excluded.  It was not ineffective assistance of counsel for Petitioner's attorney to fail to call Dr. Litman to question him about whether other FDLE laboratories do not report

frequency statistics for mixed stains.  For all of these reasons, ground twelve is without merit.

**Conclusion**

Accordingly, it is **RECOMMENDED** that the 28 U.S.C. § 2254 petition for writ of habeas corpus filed by David W. Pridgeon challenging his convictions after trial by jury and life sentence for burglary and sexual battery upon a child less than 12 years of age, in the Circuit Court of the Third Judicial Circuit, Madison County, Florida, case number 99-30-CF, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on December 26, 2006.


<u>s/    William C. Sherrill, Jr.          </u>
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**